THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTHWEST ADMINISTRATORS, INC.,

                     Plaintiff,

    v.

COLUMBIA FORD HYUNDAI, INC., a
Washington corporation,

                    Defendant.

CASE NO. C19-0101-JCC

ORDER

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 23) and Defendant's motion for summary judgment (Dkt. No. 26). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS Plaintiff's motion for summary judgment (Dkt. No. 23) and DENIES Defendant's motion for summary judgment (Dkt. No. 26) for the reasons explained herein.

## I.    BACKGROUND

### A.  Defendant's Contribution Obligations

Defendant "has employed several members of a bargaining unit represented by the International Brotherhood of Teamsters Local 58." (Dkt. No. 24 at 3.) Local 58 is an employee organization, as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"),

29 U.S.C. § 1002(4). (*Id.*) Plaintiff "is the authorized administrative agent and assignee of the Washington Teamsters Welfare Trust" ("WTWT"), "an unincorporated association operating as a Trust Fund pursuant to Section 302 of the Labor Management Relations Act of 1947 . . . to provide medical, dental, vision, and other health and welfare benefits to eligible participants." (*Id.* at 1–2.)

In August 2010, September 2014, and September 2017, Defendant and Local 58 signed successive WTWT Subscription Agreements. (*Id.* at 3; Dkt. No. 24-1 at 41–46.) Under the Subscription Agreements, Defendant agreed to be bound by collective bargaining agreements ("CBAs") between it and Local 58; such agreements existed from October 1, 2010, to October 31, 2017, the time relevant to this case. (*See* Dkt. Nos. 24 at 3; 24-1 at 48–57, 59–69, 71–80.) The Subscription Agreements also required Defendant to "accept and agree to be bound by the terms of the Trust Agreement governing the" WTWT and incorporated the WTWT Trust Operating Guidelines by reference. (*See* Dkt. Nos. 24 at 3–4; 24-1 at 2–39, 41–46, 82–122.)

Under the CBAs, Defendant agreed "to remit into the [WTWT] the maximum sum of six hundred fifty dollars . . . per employee covered by [the CBAs] who is compensated for eighty . . . hours or more [in a given month] for the following coverage: Medical Plan C, Time Loss B, Disability Waiver, Dental Plan A, Vision Plan EXT." (Dkt. No. 24-1 at 53, 64, 76.) The CBAs further provided, "The employee shall pay one hundred percent (100%) of any increases over the listed amount of ($650) as required by the Trustees of the Plan to maintain the current level of benefits. The employee's payment will be made by a lump sum deduction from the employee's paycheck." (*Id.*) Defendant was obligated to pay the contributions owed for a given month by the tenth day of the following month. (*Id.*)

Defendant's contribution obligations were also governed by the Trust Agreement and the Trust Operating Guidelines. (*See id.* at 10, 107–08, 122.) Defendant's "part-time or full-time employees who perform[ed] any work tasks covered by the [CBAs], whether or not those employees ever actually joined Local 58, [were] considered members of" Local 58. (Dkt. No. 24

at 4–5.) The Trust Operating Guidelines also provided that an employee who declined to pay the required deduction "shall be treated as declining coverage" and that Defendant would "remain obligated to continue its monthly contributions to the Trust on behalf of the employee, without regard to [the] employee's deduction decision." (Dkt. No. 24-1 at 87.)

Under the Trust Agreement, if Defendant became delinquent in its payment of contributions, Defendant "shall pay in addition to the amount of delinquent . . . contributions liquidated damages of 20% of the amount of [Defendant's] contributions due on such date following the date on which [Defendant's] contributions became delinquent as the Trustee shall determine by rule or regulation" and delinquent contributions would accrue interest at 12 percent per annum from the date the contributions became due and payable until the date Defendant paid the contributions. (Dkt. No. 24-1 at 10.) The Trust Agreement further provided that Defendant "shall reimburse the Trust Fund for all of its costs, including audit expenses, and for all reasonable attorneys' fees incurred by the Trust Fund in connection therewith, whether or not legal proceedings were instituted." (*Id.*) The CBAs also stated that "in the event the Trustees . . . are required to take legal action to collect any [of Defendant's] contributions due under this contract, [Defendant] shall be liable for all necessary costs and expenses of the litigation, including attorney fees." (*Id.* at 53, 64, 76.)

### B.  Audit of Defendant

Under the Trust Agreement, Defendant was required to provide "any and all records of [its] Employees, concerning the classification of such Employees, their names, Social Security numbers, amount of wages paid and hours worked and any other payroll records and information that the Trustees may require in connection with the administration of the Trust Fund" either on demand or "at such regular periodic intervals and in such form as the Trustees may establish." (*Id.* at 16.) Accordingly, the WTWT sends monthly remittance reports to participating employers "requesting that each Employer update the report to reflect those employees who were hired or terminated since the prior report and met the eligibility threshold to qualify for benefits." (Dkt.

No. 24 at 6.) These reports are sent to Plaintiff and Plaintiff "determines how much each participating employer owes in contributions based on the employer's own remittance reports." (*Id.*)

To ensure that participating employers are accurately reporting and contributing pursuant to their respective CBAs, Plaintiff performs audits of the employers on behalf of the WTWT. (*See id.* at 5–7.) When it performs an audit, Plaintiff compares "the employees and contributions already submitted to [Plaintiff] by employers on a monthly basis to the employer's own payroll records. The data submitted by employers to [Plaintiff] shows the employees that were eligible for WTWT benefits under the relevant collective bargaining agreement." (*Id.* at 6–7.)

Plaintiff conducted an audit of Defendant for the period of October 1, 2010, to October 31, 2017. (*Id.* at 6.) For the audit, Plaintiff compared Defendant's monthly remittance reports submitted during the relevant period, Defendant's contributions during that period, and Defendant's payroll records. (*Id.* at 7.) The audit was completed in March 2018. (*Id.*) The audit revealed that Defendant "did not report all eligible employees that met the compensable hours threshold to" the WTWT. (*Id.*; *see* Dkt. No. 24-1 at 124–32, 134–42.) Plaintiff has since revised its audit results to bill Defendant $650 per month per eligible employee that was compensated for 80 or more hours in a given month but was unreported. (*See* Dkt. Nos. 24 at 7–8, 24-1 at 134–42.)

According to the audit report's summary, Defendant's delinquent contributions total $49,400.00. (Dkt. No. 24-1 at 134.) The balance of the audit report provides year-by-year analyses of Defendant's delinquent contributions, broken down by employee,[1] pay period, hours worked, vacation and holiday time taken, the month and year Defendant did not report the compensable hours, and the total contribution amount owed by Defendant for the year. (*See id.* at

---

[1] The names of the employees at issue are Kevin Genanatti, Dennis Mortensen, Jerry Hinton, Jason Holmes, Marjorie Fest, Adam Read, and Jason Register. (*See* Dkt. Nos. 24 at 12–13, 24-1 at 135–42.) The Court will refer to each employee by their surname where relevant.

135–42; Dkt. No. 24 at 9–11.)

During the audit, Defendant stated that it did not believe contributions were required for these employees because they did not work enough hours performing bargaining unit work or because they declined benefits. (*See* Dkt. No. 24 at 12.) But because Defendant listed the employees as working in Local 58 positions or classifications and did not provide documentation showing that any hours worked were not for Local 58, Plaintiff concluded that the employees were eligible for WTWT benefits if they were compensated for 80 or more hours in a month. (*See id.*)

In March and April 2018, Plaintiff notified Defendant of its delinquent contributions. (*Id.* at 13.) Prior to the commencement of this lawsuit, Defendant paid Plaintiff $20,800 for its delinquent contributions for Fest and Read. (*Id.*) Therefore, according to the audit report, Defendant currently owes $28,600 in delinquent contributions for Genanatti, Mortensen, Hinton, Holmes, and Register. (*Id.* at 13–14.) Plaintiff asserts that Defendant also owes $5,720.00 in liquidated damages, $8,677.07 in interest as of March 1, 2020, and attorney fees and costs associated with collecting the delinquent contributions. (*Id.* at 14; Dkt. No 24-1 at 147.)

Defendant states that several of the employees at issue objected to the health coverage provided by the CBAs due to its high cost relative to their wages. (*See* Dkt. Nos. 28 at 11–13, 96; 30 at 4–6; 31 at 4–7.) Defendant thus offered the employees health benefits provided by Kaiser Permanente, ordinarily available to non-union employees, as an alternative to those provided by the WTWT. (Dkt. No. 28 at 13; *see id.* at 98–102) (Kaiser Permanente enrollment forms for Mortensen, Holmes, Hinton, Genanatti, and Register). Defendant also maintains that several of the employees personally ensured that they performed less than 80 hours of qualified work per month to avoid qualifying for WTWT's health benefits, although they did not "formally opt out of the union health and welfare benefits." (*See* Dkt. No. 31 at 2–3.) Defendant thus states that "[a]t no time from 2010 through the present were **ANY** of the employees named in the audit ever provided **ANY** benefits from the Trust pursuant to Article 6 of the CBA." (Dkt. No. 29 at 5)

1  (emphasis in original). Defendant also notes that it has been current on making pension

2  contributions for the employees at issue and that Plaintiff administers both the health and welfare

3  trust and pension trust of the WTWT. (*See id.* at 5–6.) Defendant states that Plaintiff therefore

4  "was in possession of all of the relevant material used in its audit for years, and yet prior to 2018,

5  it never indicated that [Defendant] was delinquent, nor did it strive to ensure that these

6  employees were provided health and welfare benefits." (*Id.* at 6.) Plaintiff "does not dispute that

7  the seven employees in question did not receive benefits from the . . . WTWT . . . for the time in

8  question" but argues that "that does not change [Plaintiff's] arguments or undermine its case."

9  (Dkt. No. 34 at 1.)

10      Plaintiff moves for summary judgment, arguing that Defendant owes $28,600 in

11  delinquent contributions, $5,720 in liquidated damages, $8,677.07 in interest accrued through

12  March 1, 2020, and attorney fees. (Dkt. No. 23 at 1.) Defendant also moves for summary

13  judgment, arguing that Plaintiff must disgorge $20,800 to Defendant and that Defendant should

14  be awarded its reasonable attorney fees and costs pursuant to 29 U.S.C. § 1132(g)(1). (Dkt. No.

15  26 at 1.)

16  **II.   DISCUSSION**

17      **A.   Summary Judgment Legal Standard**

18      "The court shall grant summary judgment if the movant shows that there is no genuine

19  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

20  Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute

21  about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

22  verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

23  In deciding whether there is a genuine dispute of material fact, the court must view the facts and

24  justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party.

25  *Id.* at 255.

26      "The moving party bears the initial burden of establishing the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But once the moving party properly supports its motion, the nonmoving party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.    Required Contributions Under Plan Documents

ERISA obligates participating employers to make contributions to a multi-employer trust fund in accordance with the contract and trust agreement. *See* 29 U.S.C. § 1145. Congress enacted § 1145 "to allow multiemployer welfare funds to rely upon the terms of collective bargaining agreements and plans as written, thus 'permit[ting] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law.'" *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1103 (3d Cir. 1996) (quoting 126 Cong. Rec. 23,039 (1980) (remarks by Rep. Thompson)). Thus, "Congress sought to ensure that benefit plans are able to rely on contribution promises of employers 'because plans must pay out to beneficiaries whether or not employers live up to their obligations.'" *Id.* (quoting *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir. 1990)). Accordingly, welfare funds are "entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 (7th Cir.

1  1989)).[2]

2      "The provisions of the trust agreement provide the framework with which a court should

3  analyze an employer's obligation to contribute to a health and welfare fund." *Ind. State Council*

4  *of Roofers Health & Welfare Fund v. Adams Roofing Co. of Kokomo*, 753 F.2d 561, 564 (7th Cir.

5  1985). "Trusts . . . are to be administered according to trust fund agreements. Trustees have a

6  duty to enforce the terms of their trust fund agreements regarding contributions solely for the

7  benefit of the fund beneficiaries." *Gainey v. Vemo*, 627 F. Supp. 408, 410 (W.D. Wash. 1986)

8  (citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336 (1981)). Other plan documents, such as those

9  ──────────────

10      [2] Defendant argues that Plaintiff cannot bring the instant action for delinquent
    contributions pursuant to 29 U.S.C. § 1145 because "this is a cause of action for money due and
    owing under a contract, and is barred by [ERISA]." (Dkt. No. 26 at 10–13.) Specifically,
11  Defendant contends that Plaintiff cannot seek delinquent contributions owed under the plan
    documents because the Supreme Court in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534
12  U.S. 204 (2002), limited the remedies available to plan fiduciaries to those "typically available in
    equity." (*See id.*) (citing *Great-West Life & Annuity*, 534 U.S. at 209–10). Defendant's argument
13  is difficult to comprehend, as it contradicts the plain language of the ERISA provisions at issue
    in this case and goes against a remarkable weight of authority.

14      In *Laborers Health & Welfare Trust Fund for Northern California v. Advanced
15  Lightweight Concrete Co.*, 484 U.S. 539 (1988), a case much more analogous to the instant one
    than *Great-West Life & Annuity*, the Supreme Court stated that "[t]he liability created by [29
16  U.S.C. § 1145] may be enforced by the trustees of a plan by bringing an action in federal district
    court pursuant to [29 U.S.C. § 1132]." *Laborers Health & Welfare Tr. Fund for N. Cal.*, 484
17  U.S. at 547. The Supreme Court also recognized "the special remedy against employers who are
    delinquent in meeting their contractual obligations" created by 29 U.S.C. § 1132(g)(2) and
18  observed that "Congress added these strict remedies to give employers strong incentive to honor
    their contractual obligations to contribute and to facilitate the collection of delinquent accounts."
19  *Id.* The number of federal court decisions applying these principles is hard to overstate. *See, e.g.*,
    *Adm'rs, Inc. v. Allied Prot. Servs., Inc.*, Case No. C17-1171-JCC, Dkt. No. 17 at 2–3 (W.D.
20  Wash. 2018) (describing employers' contribution obligations under § 1145 and the special
21  remedies available under § 1132(g)(2)); *Bd. of Dirs. of the Motion Picture Indus. Pension Plan v.
    S&L Tramondo, Inc.*, 2016 WL 7335579, slip op. at 5–6 (C.D. Cal. 2016) (describing required
22  elements for plan fiduciaries to "enforce obligations created under the collective bargaining
    agreement against employers who make contributions to employee benefit plans" under § 1145
23  and to be awarded remedies under § 1132(g)(2) for the same).

24      Therefore, Plaintiff's claims for delinquent contributions on behalf of the WTWT
25  pursuant to § 1145 and for the remedies provided for by § 1132(g)(2) are in fact created by
26  ERISA, not barred by it. Defendant's motion for summary judgment is DENIED on this ground.

signed by the parties or incorporated by reference, may also govern an employer's obligation to contribute to the trust. *See, e.g.*, *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959–61 (6th Cir. 1998) (noting that § 1145 "thus directs us to examine the plan documents and the collective bargaining agreement to determine the scope of New Bakery's obligation to contribute to the Pension Fund" and finding that written supplements contemplated by collective bargaining agreement were such plan documents); *Bds. of Trs. of Sheet Metal Workers Local 104 Health Care Plan v. Bay Area Balancing & Cleanrooms, Inc.*, 2016 WL 2902231, slip op. at 1 (N.D. Cal. 2016) ("Defendant was a signatory to and bound by the terms of collective bargaining, trust, and subscription agreements, which required Defendant to follow reporting requirements and make contributions based on hours worked by Defendant's employees."); *Trs. of S. Cal. IBEW-NECA Pension Plan v. M.L. Alexander Elec. Co. Inc.*, 2009 WL 10672431, slip op. at 2 (C.D. Cal. 2009) ("Each of these 'Master Agreements' bind Defendant to the 'Trust Agreements' because the Trust Agreements are incorporated by reference into the Master Agreements.").

Here, Defendant and Local 58 signed successive WTWT Subscription Agreements, each of which provided in relevant part that "[a]n enforceable Collective Bargaining Agreement must exist as a condition precedent to participation in the Trust," that the CBA "provides that contributions will be made to the Trust on behalf of all employees for whom [Defendant] is required to contribute under the Trust Operating Guidelines," and that Defendant and Local 58 "acknowledge the receipt of a copy of the Trust Operating Guidelines which by this reference are made a part hereof." (Dkt. No. 24-1 at 41, 43, 45.) The Subscription Agreements also incorporated by reference the Trust Agreement. (*See id.* at 42, 44, 46.)

Under the Trust Agreement, the WTWT had "the sole discretion and entire authority to . . . [m]ake such uniform rules and regulations as are consistent with and necessary for effectuating the provisions of this Trust Agreement" and the authority "[t]o make such other rules and regulations as may be necessary for the administration of the Plan and not inconsistent

with the purposes of the Trust Agreement." (*Id.* at 11, 14, 30, 33.) The Trust Operating

Guidelines are such rules and regulations, as they set forth the parameters for creating new

accounts, reviewing documents to determine eligibility for trust benefits, and other such

operational matters. (*See id.* at 104–22.) And the Trust Operating Guidelines were explicitly

incorporated by reference into the Subscription Agreements signed by Defendant and Local 58.

(*See id.* at 41, 43, 45, 105.) Therefore, there is no genuine dispute that the Trust Operating

Guidelines are part of the plan documents governing Defendant's obligations to the WTWT.

       The parties agree that the Trust Operating Guidelines obligate Defendant to make

contributions of $650 per month per qualifying employee to the WTWT even if a given

qualifying employee declines coverage and is thus excused from having their wages deducted.

(*See* Dkt. Nos. 23 at 17; 24-1 at 108; 29 at 9, 10–11; 32 at 2.) While Defendant contends that this

provision conflicts with the "bargained-for terms of the CBA" and thus is unenforceable, (*see*

Dkt. No. 29 at 8–11), an examination of the cited portion of the CBAs reveals no such conflict.

Under the CBAs, Defendant agreed "to remit into the [WTWT] the maximum sum of six

hundred fifty dollars . . . per employee covered by this agreement who is compensated for

eighty . . . hours or more [in a given month] for the following coverage: Medical Plan C, Time

Loss B, Disability Waiver, Dental Plan A, Vision Plan EXT." (Dkt. No. 24-1 at 53, 64, 76.) This

language required the WTWT to make available specified coverage in exchange for Defendant's

contributions.[3] It does not predicate an employer's contribution obligation on its employees

---

[3] Defendant acknowledges that the WTWT provided the coverage required under the
CBAs and instead emphasizes the coverage's prohibitively excessive cost relative to the
employees' wages. (*See* Dkt. No. 29 at 4–5.) Nonetheless, Defendant argues that the WTWT
breached its fiduciary duties under ERISA and was unjustly enriched when it accepted
Defendant's payment of $20,800.00 for delinquent contributions owed for Fest and Read but
failed to provide those employees benefits. (*See* Dkt. No. 26 at 18–21) (citing 29 U.S.C. §§
1002(21)(A), 1104(a)(1)(A), 1104(a)(1)(B); *Belguau v. Inslee*, Case No. C18-5620-RJB, Dkt.
No. 57 at 21 (W.D. Wash. 2019)). But as discussed above, the WTWT performed under the plan
documents by making benefits available to Defendant's employees. *See supra* Section II.B. The
employees' decision to decline those benefits, as contemplated by the Trust Operating

accepting the coverage provided by the WTWT. Therefore, the language of the CBAs does not conflict with the provision of the Trust Operating Guidelines that specifically contemplates the situation of a qualifying employee declining the coverage offered by WTWT. Thus, there is no genuine dispute of material fact on the issue that the plan documents in this case, comprising of at least the Trust Agreement, the Trust Operating Guidelines, the Subscription Agreements, and the CBAs, required Defendant to make contributions of $650 per qualifying employee regardless of the qualifying employees' decision as to whether to accept the provided coverage.[4] Accordingly, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED on this ground.

### C.    Results of Audit

Defendant argues that even if it was required to pay contributions on behalf of qualified employees who declined coverage, several of the employees at issue did not qualify for benefits under the CBA. (*See* Dkt. No. 29 at 11–14.) Specifically, Defendant contends that those employees employed as Fast Lube Specialists did not perform sufficient compensable work to qualify for WTWT benefits. (*See id.* at 3 n.1, 12–14.)[5]

Under ERISA, the burden is on employers to maintain adequate business records. *See* 29 U.S.C. § 1059(a)(1); *Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1338–39 (9th Cir. 1988). If an employer fails to keep accurate records of work, it is liable under ERISA to contribute for all hours worked by employees in which the employees are shown to

---

Guidelines, does not convert the WTWT's provision of the required benefits into a breach of its fiduciary duties or render its receipt of delinquent contributions unjust enrichment. Therefore, Defendant's motion for summary judgment is DENIED on this ground.

[4] Defendant's argument that the WTWT's "attempted collection of [delinquent] contributions violates the Labor Management Relations Act" is raised for the first time in a reply brief and will not be considered by the Court. *See Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006); (Dkt. No. 35 at 10–11; *see generally* Dkt. Nos. 26, 34).

[5] Defendant does not dispute that Fest and Read, who were employed as Parts Countermen, worked at least 80 compensable hours for the months at issue and therefore qualified for WTWT benefits. (*See* Dkt. Nos. 23 at 18, 25-1 at 20, 29 at 11–14.)

1    have performed *some* covered work. *Brick Masons Pension Tr.*, 839 F.2d at 1338–39. Thus, an

2    employer may not defeat a motion for summary judgment and escape liability for failure to pay

3    contributions by "hiding behind [its] failure to keep records as statutorily required." *Id.* at 1338.

4              During discovery, Defendant stated that the Fast Lube Specialists at issue performed

5    some bargaining unit work but that Defendant did not have documentation of the amount of

6    compensable work they actually performed. (*See* Dkt. No. 25-1 at 22.) Defendant apparently still

7    does not possess such documentation. Instead, Defendant now relies on the declaration of

8    Mortensen, who was employed as a Fast Lube Specialist along with Gennatti, Holmes, and

9    Hinton during the times relevant to this case. (*See* Dkt. Nos. 29 at 12–14; 31 at 1–3.)

10   Mortensen's declaration is unsupported by documentary evidence and simply states that he, other

11   Fast Lube Specialists, and the Fast Lube Specialists' managers personally ensured that Fast Lube

12   Specialists did not perform 80 hours of compensable work per month so that they would not

13   qualify for WTWT benefits. (*See generally* Dkt. No. 31.) Mortensen's declaration cannot excuse

14   Defendant from its statutory obligation to maintain adequate business records, establish that

15   Defendant is not liable under ERISA to contribute for all hours worked by the Fast Lube

16   Specialists, or defeat Plaintiff's motion for summary judgment on this ground. *See Brick Masons*

17   *Pension Trust*, 839 F.2d at 1338–39. Accordingly, Plaintiff's motion for summary judgment is

18   GRANTED and Defendant's motion for summary judgment is DENIED on this ground.[6]

19              //

20

21              [6] Defendant also argues that Plaintiff's audit findings are "far from trustworthy" and
22   therefore summary judgment as to the amount of claimed delinquent contributions is
     inappropriate, citing the revision of Plaintiff's audit findings. (*See* Dkt. No. 29 at 22–24.)
23   Defendant does not provide substantive argument or legal authority in support of its contention.
     (*See id.*) And Plaintiff has explained that the revision was due to an adjustment of the amount
24   sought per month per unreported eligible employee pursuant to the CBAs, not a revision in the
     calculation of underlying compensable hours. (*See* Dkt. No. 24 at 8.) Thus, Defendant's
25   unsupported argument is insufficient to show that Plaintiff's revised audit findings are unreliable
     and to preclude granting summary judgment as to the amount of claimed delinquent
26   contributions.

ORDER
C19-0101-JCC
PAGE - 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### D.    State Law Arguments

Defendant raises state law arguments against the enforcement of the terms of the plan documents in this case, including that the CBA is a bilateral contract that can no longer be performed, (*see* Dkt. No. 29 at 14–16) (citing *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 550 (Wash. Ct. App. 2014); *Flower v. T.R.A. Indus., Inc.*, 111 P.3d 1192, 1199–200 (Wash. Ct. App. 2005)), and that "[t]he contractual provisions Plaintiff seeks to enforce are unenforceable as lacking consideration," (Dkt. No. 26 at 13–18) (citing *King v. Riveland*, 886 P.2d 160, 164 (Wash. 1994); *Bogle & Gates, P.L.L.C. v. Holly Mountain Res.*, 32 P.3d 1002, 1004 (Wash. Ct. App. 2001)).

"ERISA contains one of the broadest preemption clauses ever enacted by Congress." *PM Group Life Ins. Co. v. W. Growers Assur. Tr.*, 953 F.2d 543, 545 (9th Cir. 1992) (quotation omitted). ERISA generally "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" and defines "State law" as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(a), (c)(1). A state law "relate[s] to" an employee benefit plan "if it has a connection with or reference to such a plan." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987). ERISA's preemptive scope is broadly construed and extends to common law tort and contract actions. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47–48 (1987); *Gen. Am. Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1522 (9th Cir. 1993) (citing *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990); *Pilot Life Ins. Co.*, 481 U.S. at 47–48) ("State tort and contract causes of action, for instance, don't apply to transactions between plans and their participants . . . because the relationship between plan and participant is, under ERISA, a matter of exclusively federal concern.")

Defendant's bilateral contract argument arises under Washington state law and undoubtedly "relates to" an employee benefit plan: Defendant essentially contends that it is excused from performing its obligations under the plan documents because the employees at issue opted out of the coverage provided by the WTWT. (*See* Dkt. No. 29 at 14–16.) Thus,

1    Defendant's bilateral contract argument falls within the broad sweep of ERISA's preemption

2    provision. *See Pilot Life Ins. Co.*, 481 U.S. at 47–48. The Court also notes that Defendant's

3    argument lacks substantive merit, as the WTWT provided the promised benefits as required by

4    the plan documents. *See supra* Section II.B.

5              Defendant's lack of consideration argument appears to also be premised on its assertion

6    that the plan documents created a bilateral contract and that Defendant was excused from

7    performing when its employees declined the WTWT's coverage. (*See* Dkt. No. 26 at 13–18.) For

8    the same reasons as its bilateral contract argument, Defendant's state law contractual claim is

9    preempted by ERISA: it clearly "relates to" an employee benefit plan and purports to regulate

10   the relationship between the WTWT and Defendant. *See Fort Halifax Packing*, 482 U.S. at 8;

11   *Pilot Life Ins. Co.*, 481 U.S. at 47–48; *Castonguay*, 984 F.2d at 1522. Moreover, Defendant's

12   argument again lacks substantive merit: the consideration Defendant received in exchange for its

13   contributions included the WTWT's provision of health benefits in accordance with the plan

14   documents. (*See* Dkt. No. 24-1 at 53, 64, 76.) Therefore, Defendant's motion for summary

15   judgment is DENIED on this ground.

16        **E.      Statute of Limitations**

17             Defendant asserts that any alleged delinquent contributions that accrued prior to January

18   23, 2013, are barred by the statute of limitations. (Dkt. No. 29 at 19–20.) "A cause of action

19   accrues, and the statute of limitations begins to run, when a plaintiff knows or has reason to

20   know of the injury that is the basis of the action." *Pierce Cty. Hotel Emps. & Rest. Emps. Health*

21   *Tr. v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1328 (9th Cir. 1987). Because the "ERISA

22   provision authorizing a civil action by a plan fiduciary, 29 U.S.C. § 1132, does not contain a

23   statute of limitations," "Washington's six year [sic] statute of limitations for actions on written

24   contracts, Wash. Rev. Code § 4.16.030," applies. *See id.*

25             Defendant asserts that Plaintiff was on "express notice" that Defendant was not making

26   contributions on behalf of the employees at issue when "the contributions for each month were

1    due" because Defendant made pension contributions on behalf of the employees but not

2    contributions pursuant to the CBAs. (Dkt. No. 29 at 20.) But the record demonstrates that

3    Plaintiff reasonably relied on Defendant's monthly remittance reports and payments, which are

4    not verified until an audit is done and are not cross-checked with payments made for other

5    benefits. (*See* Dkt. Nos. 24 at 5–6, 33 at 2–5.) Therefore, the appropriate date to determine

6    whether Plaintiff's filing of the complaint was timely is the date Plaintiff completed the audit.

7    *See Nw. Adm'rs, Inc. v. AD Auto. Distribs. Inc.*, 2006 WL 1626940, slip op. at 4 (N.D. Cal.

8    2006) ("Here, the Trust Fund appears to have relied upon Defendant's inaccurate monthly

9    reports, and would not have had reason to know of the unpaid pension contributions until

10   completing the audit in February 2005."); (Dkt. No. 33 at 5). Because the audit that revealed

11   Defendant's delinquent contributions was completed in March 2018 and Plaintiff filed its

12   complaint in this action in January 2019, Plaintiff's claims are timely under Washington's

13   applicable six-year statute of limitations. *See Pierce Cty. Hotel Emps. & Rest. Emps. Health Tr.*,

14   827 F.2d at 1328.

15        **F.    Doctrine of Laches**

16        Defendant asserts that Plaintiff's claim for delinquent contributions is barred by the

17   doctrine of laches. (*See* Dkt. No. 29 at 20–22.) "The defense of laches is unavailable in actions at

18   law governed by a statute of limitations." *Trs. of S. Cal. IBEW-NECA Pension Plan v. High-*

19   *Light Elec., Inc.*, 2010 WL 11596169, slip op. at 2 (C.D. Cal. 2010) (citing *UA Local 343 United*

20   *Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can., AFL-CIO*

21   *v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1474 n.3 (9th Cir. 1994)). As discussed above,

22   Plaintiff's claim for delinquent contributions is subject to (and timely under) Washington's six-

23   year statute of limitations applicable to actions on written contracts. *See supra* Section II.E.;

24   *Pierce Cty. Hotel Emps. & Rests. Emps. Health Tr.*, 827 F.2d at 1328. Therefore, Defendant is

25   precluded from asserting the defense of laches in this action. *See Trs. of S. Cal. IBEW-NECA*

26   *Pension Plan*, 2010 WL 11596169, slip op. at 2.

### G.      Remedy

Plaintiff asserts that Defendant currently owes $28,600 in delinquent contributions for Genanatti, Mortensen, Hinton, Holmes, and Register. (Dkt. No. 24 at 13–14.) Plaintiff asserts that Defendant also owes $5,720.00 in liquidated damages, $8,677.07 in interest as of March 1, 2020, and attorney fees and costs associated with collecting the delinquent contributions pursuant to the plan documents. (*Id.* at 14; Dkt. No 24-1 at 147.)

Plaintiff's revised audit, which calculates Defendant's delinquent contributions using the $650 per month per eligible employee mandated by the plan documents and the months in which Defendant failed to pay contributions for qualifying employees, concluded that Defendant owed a total of $49,400 in delinquent contributions. (*See* Dkt. Nos. 24 at 13, 24-1 at 134–142.) Prior to Plaintiff's filing of this lawsuit, Defendant paid $20,800 for the delinquent contributions owed for Fest and Read. (*See* Dkt. No. 24 at 13–14.) As discussed above, Defendant has not effectively challenged the revised audit's monthly rate or hours calculation. *See supra* Section II.C. Therefore, the Court FINDS that Defendant's current delinquent contributions total $28,600.

29 U.S.C. § 1132(g)(2) provides that in an action to recover delinquent contributions

in which a judgment in favor of the plan is awarded, the court shall award the plan—
(A) the unpaid contributions,
(B) interest on the unpaid contributions,
(C) an amount equal to the greater of—
(i) interest on the unpaid contributions, or
(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.

"Section 1132(g)(2) is 'mandatory and not discretionary.'" *Nw. Adm'rs, Inc. v. Albertson's, Inc.*, 104 F.3d 253, 257 (9th Cir. 1996) (quoting *Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying, Co.*, 746 F.2d 557, 569 (9th Cir. 1984)). For a court to grant a mandatory award under § 1132(g)(2), "the following three requirements must be satisfied: (1) the employer must be

delinquent at the time the action is filed; (2) the district court must enter a judgment against the employer; and (3) the plan must provide for such an award." *Id.*

Here, all three requirements for a mandatory award under § 1132(g)(2) are met. Defendant was delinquent in its contributions to the WTWT at the time this lawsuit was filed. (*See* Dkt. Nos. 24 at 13–14, 24-1 at 134–142.) Plaintiff is entitled to judgment against Defendant for those delinquent contributions under § 1145, as Defendant has not established any basis to excuse it from its obligation to contribute to the WTWT pursuant to the plan documents. *See supra* Section II.B. And an award of liquidated damages, interest, and attorney fees and costs are allowed under the Trust Agreement, (*see* Dkt. No. 24-1 at 10), and the CBAs, (*see id.* at 53, 64, 76). Therefore, the Court FINDS that, pursuant to the plan documents, Plaintiff is entitled to its requested awards of $5,720.00 in liquidated damages, $8,677.07 in interest as of March 1, 2020, and reasonable attorney fees and costs associated with collecting the delinquent contributions. *See* 29 U.S.C. § 1132(g)(2); *Nw. Adm'rs*, 104 F.3d at 257.[7]

Defendant contends that Plaintiff is not entitled to any relief because it cannot show that the WTWT suffered damages or will suffer damages in the future. (*See* Dkt. No. 29 at 16–19) (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209–10 (2002); *Gaasland Co. v. Hyak Lumber & Millwork, Inc.*, 257 P.2d 784, 787–88 (Wash. 1953)). Defendant's argument cannot square with the plain language of ERISA. Under ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. And "[i]n any action under [ERISA] by a fiduciary for or on behalf of a plan to enforce section

---

[7] Defendant also requests its reasonable attorney fees and costs as the prevailing party. (Dkt. No. 26 at 22–24) (citing 29 U.S.C. § 1132(g)(2); *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 249 (2010); *Hummel v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980)). Because Defendant has not prevailed on any ground raised in its motion for summary judgment, Defendant's request for reasonable attorney fees and costs is DENIED.

1   1145 of [ERISA] in which a judgment in favor of the plan is awarded, the court shall award the

2   plan . . . the unpaid contributions" along with interest, liquidated damages, reasonable attorney

3   fees and costs, and "such other legal or equitable relief as the court deems appropriate." 29

4   U.S.C. § 1132(g)(2). Defendant is an employer within the meaning of ERISA, Plaintiff is a

5   fiduciary of the WTWT, and Plaintiff is entitled to judgment in favor of the WTWT for

6   Defendant's failure to pay contributions required under the plan documents. Therefore, no

7   additional showing of damages is necessary: the Court is obligated to award Plaintiff and the

8   WTWT the value of the unpaid contributions along with other appropriate forms of relief. *See* 29

9   U.S.C. §§ 1132(g)(2), 1145; *Nw. Adm'rs*, 104 F.3d at 257.

10  **III.   CONCLUSION**

11           For the foregoing reasons, the Court hereby GRANTS Plaintiff's motion for summary

12  judgment (Dkt. No. 23) and DENIES Defendant's motion for summary judgment (Dkt. No. 26).

13  The Court accordingly ORDERS that Plaintiff is entitled to judgment in its favor and to an award

14  of $28,600.00 in delinquent contributions, $5,720.00 in liquidated damages, $8,677.07 in interest

15  accrued as of March 1, 2020, and its reasonable attorney fees and costs. Within 14 days of the

16  date this order is issued, Plaintiff shall file an appropriate motion for its reasonable attorney fees

17  and costs. In its motion, Plaintiff may include an updated accrued interest value.

18           DATED this 12th day of May 2020.

19

20

21

22           John C. Coughenour
             UNITED STATES DISTRICT JUDGE

23

24

25

26